Okay, thank you, Your Honor. My name is David Lillian, Your Honor. My name is David Lillian Stein, and I represent the appellants in this action, Brian H. and his son, Alex H. I would like to reserve three minutes of your time. So may it please the Court, there has been a lot of talk, a lot of ink spilled recently on the subject of these mental health level of care guidelines, both in this case as it relates to Blue Shield and its handling of my client's claim, but also on an industry-wide basis as it relates to whether these proprietary, insurer-created mental health guidelines reflect proper standards of medical care, specifically in the area of non-acute residential treatment. Over the years, the more these guidelines are scrutinized, the less they hold up, to the point where thousands of claims may be reprocessed using non-proprietary guidelines, and to the point where such proprietary guidelines beginning next year appear to be prohibited from use in California. Mr. Lillian Stein, on that point, I'm not sure how I see that that's an issue in this case. The district judge said the only evidence in front of me is that the Magellan guidelines, and I take it also the Milligan guidelines, are representative of the standard of care. No contrary evidence has been presented, but did you present any evidence in the district court that these guidelines were not representative of the appropriate standard of care? I understand, your honor, and the first thing I would respond with is that if there's any level of skepticism that should be applied, all of these sort of big picture items factor in, but we did provide the article, and a court is allowed under, I believe, the Nolan case when there is skepticism because a conflicted plaintiff administrator, which I'll get into a little more detail in a minute, that a careful consideration of conflict includes evidence outside of the administrative record. That Plank article is evidence of the administrative record, and I think the Witt case was very severe. One of the few cases that has had extensive inquiry was a class action that specifically opined on proprietary level of care guidelines, not the specific ones in this case to be here. That's a different carry, and I acknowledge that, but these guidelines are very similar in some degree, and certainly the Witt case, which was a very long opinion, the court was like, oh, that's a really long opinion. There was a lot to digest from that if the court is seeking to be educated on what the very, very, you know, narrow subject of public care guidelines meant. Oh, yes, Ron. I'm trying to be fair to the district judge who has testimony in front of her that these guidelines are consistent with the standard of care and gets an article that's written and said, finds, I think, on the record in front of her that it wasn't arbitrary and capricious to use them. It may turn out that that's wrong, that we now know better, but at least in terms of what that she aired in believing the testimony that these guidelines were consistent with the standard of care. Well, I think the answer is yes, but I'll let me continue, and maybe I can give you a little more detail on that. Well, before you do, let me, because I don't want this to get lost along the way. I'm having some trouble with the record in this case, and I want to get your understanding of it. To me, your critical piece of evidence is the letter from Dr. Morrison that says, you know, my opinion is that Alex needs presidential care. Your brief says that letter was submitted in conjunction with the first appeal to Blue Shield, but as I read the record, the first appeal to Blue Shield was decided before that letter was dated. And so I'm trying to figure out what your position is, where the, how and when this letter was put before Blue Shield. I know, because the independent medical reviewer looks at it and says, I've got this letter from Dr. Morrison. It's listed among things that he says. So I know the IMR had it, but when was it put in the record before Blue Shield, if you can tell me? I think the answer to that is that we distinguish, there was the first denial, which is in September, I believe, and then two weeks later, there is a very quick upholding of that denial. But then you get denied first, you get denied first on 9-24-2015, your appeal. It goes to, and that appeal is denied on 10-7. The report is dated 10-23 or some number like that. So I'm trying to figure out where you submitted this report to Blue Shield. I know you your honor's referring to is the expedited appeal. It was a much fuller appeal and denial on April 9-2016, which is at ER. That's where Blue Shield changed the level of care guidelines they've used from these Magellan guidelines to the Milliman guidelines. I understand your complaint about that. I'm asking, where is there in this record any evidence that you actually submitted the Blue Shield? I believe, well, I can show you the entire appeal documents. I didn't have that prepared. I looked for that. I've been through all the documents and I find the Morrison letter referred to in the IMR. I know it wasn't, I know contrary to your brief, it wasn't submitted with the first expedited appeal because it's dated after. I don't find any reference to it anyplace else until you ask for a second IMR and the IMR sends back to Blue Shield and says, here's all the stuff I had from the first time. Is there any, you know, is this, do you think this warrants, is there anything new? And Blue Shield says no. So I'm still, I still can't find in this record any evidence that you gave this Morrison letter to Blue Shield as opposed to the IMR. I will double I'm going to ask him the same question, so if you can't answer it, maybe he can. Okay. I think a lot of these doctors' records were appealed. The first appeal was when my client was unrepresented. He didn't have anybody helping him with the appeal. By the time of the, this second appeal, which I guess Aaron called the first appeal, by the time of the April appeal, we believe there were a lot of these doctors' records, not just Morrison, but Dr. Rocio, a PhD report, a psychologist, Gareth, the other ones were in Blue Shield. Okay, so if that gets your related question is, put aside the Morrison letter for a second. What other evidence did you have that spoke of the necessity for residential treatment as opposed to some alternative? In other words, I don't think there's any doubt in this case that Alex needed mental health. The question is, the only thing I can find that you submitted that talked about the necessity for residential treatment was the Morrison letter. Am I missing something? Well, I think there's two issues here. The first is that the standard that was being used in these appeals was for acute level residential treatment. These are based on the guidelines. The guidelines are not planned terms. And the planned term expressly states that residential treatment, residential care, is for non-acute inpatient care, for members who do not require acute inpatient care. You look at these denial letters, you'll see that the standards they use based on the guidelines were all focused on acute inpatient care. The standard that was being used, forget about medical necessity, which is a planned term, the standard that was being used was not the proper standard to begin with. I understand that argument, but I asked a factual question. Is there anything else in the record that says it's medically necessary that this child be treated in residential program? Your Honor, I think what you have is the history of this case, which is to say a child who, I won't go through the entire history, but he was a good student. He was called gifted, academically gifted after PR 395. He did well in school. He had friends. Then suddenly he gets a major depressive disorder accompanied by psychotic features, given that his mother had, you can understand how that happened. He had anxiety disorder. That's in the record. He had PTSD. No wonder he would have post-traumatic stress disorder when his mother became paranoid. He suffered panic attacks in school. He began failing his classes. That's in the record. He wasn't doing his homework. He lost his friends. The district court summarizes this to say, well, he had some problems. He sought outpatient treatment. There are some records that say he sought outpatient treatment. But eventually, at the court, he stopped going to school, didn't leave his room, and he was delusional. You also have the issue that his father did his best, and I think we really should be applauded for trying, did his best to help his son, but he, too, was suffering from depression. He couldn't supply the necessary support at home, so the schools can't help him. His home environment can't help him. His outpatient therapy of his doctors recommended the ability to support a 24-7 residential treatment. The thing is, this case is about two months from residential treatment. Some of these cases are two years or a year. You also have the statement from Alex himself. We don't usually see statements from the actual patient. It says, this was given to the district court, going to residential treatment saved my life. I'm not sure how anybody could conclude that, given his famous information, given that he couldn't even go to school, I think one note says he couldn't even pick up a pen, how would any kind of conclusion that could be, well, you know, maybe he just needs more outpatient treatment. I think that's the big problem. Here's my difficulty, and that's why I keep focusing on the Morrison letter. Three independent psychologists, psychiatrists, looked at this record and said, we don't see the medical necessity. They may have been using the wrong standards, put that aside for a second. And so if we're looking at abusive discretion by Blue Cross, or Blue Shield in this case, sorry, by Blue Shield in this case, it's hard for me to get there in the absence of them not having looked at something that was relevant or ignoring something that was relevant. And they saw, they had all this information that you've talked about in front of them. They looked at it. Nonetheless, a psychiatrist said, I think a lower level of care would have been sufficient. So I'm trying to focus on this letter because this is a treating physician that says he needs residential treatment. And they should have at least have dealt with it if they were presented with it. And so that's why I want to be fair with you and say, that's why this letter is so important. I understand. I think you have the, I'm beyond my time. So I don't want, I don't want to go into my rebuttal time. I would like to answer your honor's question. You have the Rochios report, which is dated 11, 10, 2015. I believe Blue Shield had that. You have the McVicker report, which is also undated, but about my chronology, about the same time. You have the Harris report from visions after he left because the appeal, that second appeal wasn't decided until after he was out of the treatment. But I also want to say that we don't believe the abuse, the mere abuse of depression was appropriate given most of the procedural violations. And I'd like to at some point talk about the procedural violations, whether they rise to the point of requiring some sort of standard of review, everything. I'm sorry, I broke up and I didn't hear that last part of your sentence. Oh, these procedural violations rise to the level of at least requiring some degree of skepticism. We don't believe the court considered them. If not a transfer, transforming the standard of to having a gynecologist medical director decide an appeal for a young adult man to not providing the guidelines to my clients at all, that deprived him of a full and fair review and the meaningful dialogue. I think that's pretty substantial when a carrier doesn't give its claimant, it's insured the actual guidelines are being used. I'll reserve time. I know I've gone over. All right. Thank you. Thank you. Mr. Laska. Good afternoon, your honors. May it please the court. Can everyone see and hear me okay? We can hear you. Yes. Okay. Thank you. Let me just begin by apologizing for the technical difficulties. I don't know what happened, but I'll have to make sure it doesn't happen again. No problem. We've seen it before and I'm sure we'll see it again. Go ahead, counsel. It's never been a problem before, but I'll get to the bottom of it. Thank you. So I'm going to skip over some of my prepared remarks and go directly to answering some of Judge Hurwitz's questions because I think they really get to the heart of the matter. The first question about the Magellan guidelines. The court is absolutely right that this case is actually unusual because unlike a normal ERISA case where the claimant is limited to the administrative record, the court in this case gave the plaintiffs several chances to submit unlimited evidence to support their claims after the fact, extra record evidence, to support their argument that the Magellan guidelines were inconsistent with the standard of care. And not only did the plaintiffs not submit any admissible evidence after that, but they actually testified that despite their best efforts, they had been unable to marshal any evidence. So yes, I think that's exactly right that whatever, first of all, there's no evidence anywhere that the Magellan guidelines are faulty, but even if there were, that's not this case. And it certainly was not before the district court. And secondly, Your Honor is correct that the Morrison letter, as far as we can tell from the record, was submitted first to the DMHC on the second IMR. And that was the first time that it entered the record. Now, they did send it to Blue Shield and ask if that changed the opinion at all. Blue I'm sorry. It was submitted to the first IMR reviewer. We know that because his report says so. But what you're saying is that you didn't see it until the second, the request for the second IMR was made. And the IMR reviewer said, here's what I had the first time. Is there anything new? That's what we have, according to the record, Your Honor. If the Morrison report, just hypothetically, if it had been submitted to you in conjunction with an appeal, because it comes from a treating physician, there would be a procedural problem here with the fact that nobody addressed it, wouldn't there? Well, not addressed it, Your Honor, but reviewed it. It's important that it was reviewed. And we know at the very least that it was reviewed by Blue and the Black and Decker case says that not only is there no treating physician rule, but there's also no discreet burden to specifically address any conflicting evidence there. I'm sorry. This is one of the problems with Zoom. So go ahead and finish and I'll wait for you. No, that's fine. I was just going to say that the important thing is to show that it was reviewed by Blue Shield, not that Blue Shield had an obligation to say, well, we credit this information, but we're relying on this. At this point, there were already numerous independent reviews in the file that essentially agreed with the underlying clinical information that the data didn't show any risk of harm for this particular claimant, but disagreed with the conclusion that residential treatment was nonetheless the correct level of care for him. Every reviewer who looked at this concluded the same thing that Alex did need mental health treatment, that was undisputed, but that the proper level of care would have been a different level of care, intensive outpatient, which was something that would not have required him to leave the house and stay overnight 24-7 somewhere for two months. I guess what I'm saying is this, the first set of reviewers and the second set of reviewers, first appeal, second appeal, both say there's no indication that he presents a danger to himself or others. And obviously the Morrison report is some indication that he does. So if it had been in front of them, it would seem to me they would have had to have at least said something about it. Your argument is it wasn't in front of them because it wasn't brought to your attention until the request for the second IMR. That's exactly right, Your Honor. And I also did want to point out that while Dr. Morrison, he says that he believes there may be a risk to this particular member, he also says... They can find it differently. They just don't treat it at all. So my next question is about the last thing your colleague mentioned. There were three appeals here. In the third appeal, it's reviewed by a Blue Cross medical director who's a OBGYN, I think. Doesn't that deviate from the requirement that a specialist look at it? It doesn't, Your Honor, because in both cases, the review was done by Dr. Batten. Dr. Batten is a Blue Shield medical... Is an OBGYN, and that is why he consulted with, in the case of the first review, two independent experts, both board certified child and adolescent psychiatrists. Focusing solely on the third one, Dr. Batten appears to turn it down on his own. Well, Your Honor, he turns it down. He reviews the information, determines that there's nothing new in there that changes anything, and then repeats the same rationale from the earlier reviews because the information didn't change. Dr. Batten is an OBGYN, but he can look at the different issues. So taking a step back and looking at this again, what's really unusual about this case, again, is two things. First, the sheer number of reviews that we have. Usually there's a denial, an appeal, there may be an expert review or two. In this case, plaintiff submitted three appeals to Blue Shield, tried three independent medical reviews with the regulator, and in the course of this, we end up with a record with eight separate physicians, including six board certified child and adolescent psychiatrists, all saying the same thing, that Alex definitely needed care. He did not need residential treatment. It wasn't medically necessary. He could have been treated at the intensive outpatient level. What's also unusual about this case is that the plaintiffs had the opportunity, not given in every ERISA case, to submit unlimited evidence to support their claims, and they didn't do that. If I may, Your Honor, the plaintiff, I think, signaled that he intended to address the standard of review issues and the procedural regularities in his rebuttal, so I'd like to preemptively address those, if I may. I think that the plaintiffs are conflating in their abuse of discretion analysis here, they're conflating really three separate things. The first is, what is the standard of review under the plan terms, and is there a structural conflict? The second is, if there is, whether and to what extent that structural conflict factors into the analysis, it depends on whether there's any evidence that it actually affected the decision. And third, there's this separate thing that if the administrator has committed procedural errors that are so flagrant and egregious, then they may apply, they may justify applying de novo review. Here, the district court did exactly what it was supposed to do. It properly determined that the standard of review was abuse of discretion. Plaintiffs don't challenge that finding. The court then examined plaintiff's evidence of bias, which, as counsel previewed in his opening argument, are allegations of several procedural irregularities. The court examined each one of those, not only on the first order, determining the standard of review, but again at the merit stage and concluded that supported by the evidence. So there was no evidence that the structural conflict had actually affected the decision, and so then there was certainly no procedural violation so egregious to warrant de novo review. So the district court proceeded to apply abuse of discretion review, noted the structural conflict, but weighted very little, if any. And all of this is perfectly consistent with the case law, including Abati, which the court cited in its first order. So I think with that, we've addressed all the points that we wanted to raise in our papers. I'm happy to answer any additional questions that the panel has. It doesn't appear that we have any questions. Thank you very much, counsel, for your argument. There's a little bit of time on rebuttal left. Yes, thank you, your honor. So I think one of the most noteworthy things about counsel's statement was that under NORD, there's no obligation to adhere to the treating physician. And we do agree that that is the NORD position, but I believe on the issue of whether or not Blue Shield had these records from the physicians, clearly Blue Shield did. It's interesting because you can't tell from the claim notes, you can't tell from anything what they had or didn't have. There is a note in one of the appeals that says your provider has not established. So clearly they had something. They're not saying what because they don't know what it's specific. But I think the bigger point is plaintiff, I'm sorry, if someone didn't have this, you don't have the right, it's hard enough to prove without... You're fading out, counsel. Sorry. It's hard enough to prove a case with these guidelines than it is to not even have the guidelines, whether it's for intensive outpatient, outpatient, partial hospitalization, intensive hospitalization, hospitalization, or residential treatment. He didn't have anything. And as soon as Blue Shield failed to provide my client with the actual criteria that are being used, you can't say, well, they had all these opportunities. You didn't know what they were trying to prove. Blue Shield never provided the information. So you have to give them the documents. That is a pretty substantial procedural violation that would have warranted skepticism by the district court. And on the standard of review, clearly there should not have been pure abuse of discretion. There needed to be some level of tempering that with the skepticism. The district court didn't offer any skepticism. The district court at first was willing to remand this case back to Blue Shield for a cleaner handling process, presumably using guidelines given all the uncertainty in this case. Thank you, counsel. We've got your argument. You're over time, but got it. I thank counsel for both sides for your argument and that the matter is submitted for decision by the court. Thank you, your honor. And that concludes our argument calendar for today. Thank you. This court for this session stands adjourned.
judges: Tashima, Nguyen, Hurwitz